

# NUMBER 13-11-00230-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

RAUL HERNANDEZ,                                                  Appellant,

v.

THE STATE OF TEXAS,                                              Appellee.

### On appeal from the 175th District Court
### of Bexar County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Garza and Vela**
**Memorandum Opinion by Justice Rose Vela**

A jury convicted appellant, Raul Hernandez, of abuse of official capacity, a Class A

misdemeanor. *See* TEX. PENAL CODE ANN. § 39.02(a), (b) (West 2011). The trial court

assessed punishment at two years' community supervision, plus a $1,500 fine. In three issues, appellant argues the trial court erred by: (1) failing to give the jury an accomplice-witness instruction; (2) denying him the right to confront and cross-examine witnesses; and (3) admitting testimony alleging he had a predisposition to accept a bribe. We affirm.[1]

## I. DISCUSSION

### A. State's Evidence

In late March or early April 2008, Jose Luis Aguilar, a Mexican national, was paid $350 for installing lights at Monarch Motors, a San Antonio used-car dealership. About the time he got paid, appellant, a Bexar County Sheriff's deputy, was shopping there for a BMW. Aguilar approached appellant, who was in uniform, asking where to pay the fine for a speeding ticket he received. Appellant asked to see the ticket, and when Aguilar gave it to him, appellant said he knew the officer who issued the ticket and said "he could speak to his friend so that the friend could take away that ticket before it would reach the Court." When the prosecutor asked Aguilar, "Did Deputy Hernandez [appellant] ask you for anything in exchange for this service?", he said, "Well, it was the money." Regarding the $350, the following colloquy occurred between the prosecutor and Aguilar:

> Prosecutor: Did Deputy Hernandez tell you to do anything with your $350 in exchange for fixing your ticket?
>
> Aguilar: They told me that I could give that money that I was going to receive as an exchange to cancel the ticket.
>
> Prosecutor: To whom were you to give the money?

---

[1] This appeal was transferred from the Fourth Court of Appeals pursuant to a docket-equalization order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2005).

Aguilar:      To the officer.

Prosecutor:   Did you give the money to the officer?

Aguilar:      I gave the money to the officer.

Aguilar also testified appellant gave him his telephone number. He stated appellant did not do anything about the speeding ticket "because later I received an order for my arrest."

On cross-examination, when defense counsel asked Aguilar, "Did you tell us earlier during direct testimony that you gave $350 in cash to the deputy?", he said, "That's what I recall." When defense counsel asked him, "Do you recall in the past telling people that you didn't give any money to the deputy, but that you gave $350 to the owner's[2] son?", he said, "What I do recall is that that money stayed there [at Monarch Motors]. I don't recall exactly if I gave him the money but the money stayed there."

Damian Carrillo, whose brother owned Monarch Motors, was at the dealership the day appellant came there to buy the BMW. Damian remembered that appellant and Aguilar had a discussion about a traffic ticket. When the prosecutor asked Damian, "[W]hat was your impression of the deal between the Defendant and Jose Aguilar?", he said, "My impression was that they were negotiating the ticket." By "negotiating the ticket," Damian meant that "[f]or somebody to pay some money and that they take the ticket away." When the prosecutor asked him, "How much money?", he said, "Three hundred and something."

---

[2] By "owner's," defense counsel is referring to the owner of Monarch Motors.

3

Rene Carrillo, the owner of Monarch Motors, identified State's exhibit 4 as a sales contract[3] for a BMW, which he sold to appellant. When the prosecutor asked Rene, "Was there ever a $350 payment made to hold this vehicle until payment was made?", he said, "It was just like a down payment for work from Jose Luis [Aguilar]." When asked "[w]as it Jose Luis [Aguilar] who paid the $350?", he said, "Yes. He had to pay it to me." On cross-examination, when defense counsel asked Rene, "[W]hat you are telling us is that there was a $350 cash down payment made; is that correct?", he said, "It was a deposit, but it wasn't done in cash."

Emanuel Carrillo worked at Monarch Motors in 2008 when Aguilar installed the lighting. He was responsible for paying Aguilar for the work, and he paid him $350 in cash. Regarding appellant's purchase of the BMW, when the prosecutor asked Emanuel, "[Y]ou took a deposit and then later he [appellant] paid for the vehicle?", he said, "Correct." When asked "[h]ow much was paid [for the deposit]?", he said, "$350" in "cash." When the prosecutor asked him, "Did you receive that from the Defendant or did you receive that from someone else?", he said he received it from Aguilar. Emanuel stated that after the deduction for the $350, the purchase price for the BMW was $3,800. He testified that when somebody makes a deposit on a vehicle, the deposit is applied to the vehicle's purchase price.

On cross-examination, Emanuel testified he took the $350 but did not "write a receipt" for the money. He did not remember the date he received the $350.

Sergeant Salvador Marin, the lead investigator in this case, testified he interviewed Aguilar after the incident and that Aguilar told him:

---

[3] The trial court admitted State's exhibit 4 into evidence without objection.

that there was a deputy or an officer, or a policeman he called him, policia, a policeman, that he approached to ask him where is a particular court located because Aguilar had been issued three traffic citations by one of the Bexar County Sheriff's patrol officers, and he wanted to know where he had to go to court on this. So when saw [sic] this policeman, as he called him, at a car lot, or a sales car lot there on 35 South and Brunswick, on the south side, he approached him and asked him, where is this court located so I can go. And he told me that the officer asked to give him the ticket so he could view it, which he did, and that the officer told Aguilar, you know what, I personally know the Judge, I personally know the deputy that gave you the tickets, and I can make them go away. And from that point on, Aguilar says that there was some other person in the office of this car sales lot that made a suggestion to the deputy, well, he can probably repay you back in doing some electrical work or some other kind of jobs, but that the officer didn't agree to that. The officer told Aguilar, why don't you make a down payment for a car that I want to buy. I want to buy a BMW, why don't you do that, and I'll take care of the tickets.

And Aguilar tells me that that's exactly what he did. Aguilar said that he had $350 cash money on him because he had done some work there at Monarch Auto Sales for the owner, which consisted of some insulation and electrical work, and made 350 bucks cash.

So Aguilar used that $350 as a down payment for the officer, which was Hernandez. So that was the down payment for the car and the means of repaying him back for doing him the favor of taking care of the tickets, making them disappear. . . .

On cross-examination, when defense counsel asked Sergeant Marin, "[W]ere you ever able to determine whether there was any documentation or record indicating that $350 in cash had been paid to Monarch Motors?", he said, "No, sir." He found no written evidence showing someone had made a down payment on the BMW bought by appellant.

Detective David Davila met with Aguilar after the incident. He testified Aguilar told him that:

he [Aguilar] had gotten a ticket from a county officer when he was going to Pick and Pull to get a light bulb for his car. . . . He said, anyway, he didn't

5

know where to go to take care of this ticket. And he told me he does work for the car lots, he does mechanical work. While going by Monarch or Monarcho, car lot, he saw an officer that he recognized the uniform as being a county officer, and being he has done work there, he stopped and asked the officer—showed the officer the ticket and told him, hey, where do I need to go to take care of this ticket, and that the officer told him, hey, I know the officer that gave you the ticket and I know the Judge there. If you pay what the down payment that they are asking for this car, I'll take care of it.

## B. Defense Evidence

Kathleen Jasinski, a Bexar County deputy sheriff, testified that in early April 2008, she took appellant to pick up a vehicle "along 35 South from our office." When defense counsel asked her, "When you . . . gave him a ride to pick up the car, did you know whether or not he had just found and purchased a car that very day?", she said, "Yes. . . . [H]e . . . said he just found and purchased a car and needed a ride to pick it up." She did not know the exact date this happened, but said it happened during "the spring time of '08." She just dropped him off at the car dealership but did not "stick around."

Martin Marin, a custodian of records for Generation Federal Credit Union, testified that up to March or April 2008, Generation Federal was known as San Antonio City Employees Federal Credit Union (SACEFCU). He identified Defendant's exhibit 4[4] as a copy of a check from SACEFCU. The check, dated April 4, 2008, was made out to Monarch Motors for $3,947.50. When defense counsel asked Marin, "And does it have on there that it's for a BMW?", he said, "Yes, sir."

Appellant's daughter, Stephanie Hernandez, testified that in April 2008, appellant bought her a red BMW. When she was driving the car to church, she noticed the radio speakers were "blown out," and nothing on the radio "really worked at all." The next day,

---

[4] The trial court admitted Defendant's exhibit 4 into evidence without objection.

appellant had the radio fixed.   She was not present when appellant bought the BMW.

## II. DISCUSSION

## A. Accomplice-Witness Instruction

In issue one, appellant argues the trial court erred when it refused his request for an article 38.14 accomplice-witness instruction regarding Aguilar.   *See* TEX. CODE CRIM PROC. ANN. art. 38.14 (West 2005).   Appellant contends Aguilar was an accomplice as a matter of law, and alternatively, at least an accomplice as a matter of fact.

### 1. Standard of Review

We review a claim of jury-charge error using the procedure announced in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985).   First, we determine whether error exists in the charge.   *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005) (citing *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003)).   If error exists, and the appellant objected to the error at trial, reversal is required if the error "is calculated to injure the rights of the defendant," which is defined to mean that there is "some harm." *Almanza*, 686 S.W.2d at 171.   If the appellant did not object to the error, error must be "fundamental" and will require reversal only if it was so egregious and created such harm that the defendant "has not had a fair and impartial trial."   *Id.*

### 2. Applicable Law

"[U]nder Texas Code of Criminal Procedure article 38.14, a conviction cannot stand on an accomplice witness's testimony unless the testimony is corroborated by other, non-accomplice evidence that tends to connect the accused to the offense." *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011) (citing TEX. CODE CRIM.

PROC. ANN. art. 38.14).   "An accomplice is a person who participates in the offense before, during, or after its commission with the requisite mental state."   *Id.* (citing *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007) (citing *Paredes v. State*, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004); *Kunkle v. State*, 771 S.W.2d 435, 439 (Tex. Crim. App. 1986)); *see Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2005) (stating that an accomplice is an individual who participates with a defendant in the commission of a crime by doing some affirmative act with the requisite culpable mental state that promotes the commission of that offense).   "Presence at the crime scene does not make a person an accomplice[5]; an accomplice must have engaged in an affirmative act that promotes the commission of the offense that the accused committed."   *Smith*, 332 S.W.3d at 439 (citing *Druery*, 225 S.W.3d at 498).   "A person is not an accomplice if the person knew about the offense and failed to disclose it or helped the accused conceal it."   *Id.* (citing *Gamez v. State*, 737 S.W.2d 315, 322 (Tex. Crim. App. 1987)).

"A State's witness may be an accomplice as a matter of law or as a matter of fact."   *Id.* (citing *Cocke*, 201 S.W.3d at 747).   "The evidence in each case will dictate whether an accomplice as a matter of law or fact instruction is required."   *Id.* (citing *Cocke*, 201 S.W.3d at 747; *Blake v. State*, 971 S.W.2d 451, 455 (Tex. Crim. App. 1998)).   "When the evidence clearly shows (i.e., there is no doubt) that a witness is an accomplice as a matter of law, the trial judge must instruct the jury accordingly."   *Id.* (citing *Gamez*, 737 S.W.2d at 322).   "A witness who is indicted for the same offense or a lesser-included offense as the accused is an accomplice as a matter of law."   *Id.* (citing *Cocke*, 201 S.W.2d at 748; *Ex parte Zepeda*, 819 S.W.2d 874, 876 (Tex. Crim. App. 1991); *Solis v. State*, 792

---

[5] *Kunkle v. State*, 771 S.W.2d 435, 439 (Tex. Crim. App. 1986).

S.W.2d 95, 97 (Tex. Crim. App. 1990); *Herrera v. State*, 115 Tex. Crim. 526, 27 S.W.2d 211, 212 (1930); *Chastain v. State*, 97 Tex.Crim. 182, 260 S.W.172, 172 (1924)). "But if the State dismisses the indictment before the witness testifies, the witness is no longer deemed an accomplice as a matter of law." *Id.* (citing *Garza v. State*, 164 Tex.Crim. 9, 296 S.W.2d 267, 268–69 (1956) (citing *Herrera*, 27 S.W.2d at 212; *Crissman v. State*, 93 Tex.Crim. 15, 245 S.W. 438, 438 (1922); *Jones v. State*, 85 Tex.Crim. 538, 214 S.W. 322, 329 (1919)). "A witness continues to be regarded as an accomplice, however, if the witness agrees to testify against the accused in exchange for the dismissal of the charge." *Id.* (citing *Oates v. State*, 48 Tex.Crim. 131, 86 S.W. 769, 772 (1905); *Barrara v. State*, 42 Tex. 260, 264 (1874)). "When there is doubt as to whether a witness is an accomplice (i.e., the evidence is conflicting), then the trial judge may instruct the jury to determine a witness's status as a fact issue." *Id.* at 439–40 (citing *Druery*, 225 S.W.3d at 498-99; *Gamez*, 737 S.W.2d at 322). "Finally, when the evidence clearly shows that a witness is not an accomplice, the trial judge is not obligated to instruct the jury on the accomplice witness rule—as a matter of law or fact." *Id.* at 440 (citing *Gamez*, 737 S.W.2d at 322).

### 3. Aguilar's Status As An Accomplice Witness

Concerning the offense of abuse of official capacity, the Texas Penal Code provides: "(a) A public servant commits an offense if, with intent to obtain a benefit or with intent to harm or defraud another, he intentionally or knowingly: (1) violates a law relating to the public servant's office or employment; . . . ." TEX. PENAL CODE ANN. § 39.02(a)(1) (West 2011). "'Law relating to a public servant's office or employment' means a law that specifically applies to a person acting in the capacity of a public servant

9

and that directly or indirectly:  (A) imposes a duty on the public servant; or (B) governs the conduct of the public servant."  *Id.* § 39.01(1)(A), (B).  A "[p]ublic servant' means a person elected, selected, appointed, employed, or otherwise designated as one of the following, even if he has not yet qualified for office or assumed his duties:  (A) an officer, employee, or agent of government: . . . ."  *Id.* § 1.07(a)(41)(A) (West 2011).

Under the law of parties, "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both."  *Id.* § 7.01(a).  A person is criminally responsible for the offense committed by another if, acting with intent to promote or assist the commission of the offense, the person solicits, encourages, directs, aids, or attempts to aid the other person's commission of the offense.  *See id.* § 7.02(a)(2).

In the present case, even though Aguilar did not propose to give appellant $350 to take care of his speeding ticket, he testified appellant told him, "he knew that officer that had given it [the ticket] to me.  And he said that he could speak to his friend so that the friend could take away that ticket before it would reach the Court."  When the prosecutor asked Aguilar if appellant asked him for anything in exchange for this service, he said, "Well, it was the money," referring to the $350 that Monarch Motors had just paid him. Knowing what appellant offered to do for him, Aguilar willingly gave the $350 to appellant in exchange for this service.  Thus, Aguilar participated in the offense either before, during, or after its commission with the requisite mental state.  *See Smith*, 332 S.W.3d at 439.  By giving appellant the $350, he engaged in an affirmative act that promoted the appellant's commission of the offense.  *See id.*  Accordingly, the State could have

10

prosecuted Aguilar for the offense of abuse of official capacity under the law of parties. *See* TEX. PENAL CODE ANN. §§ 7.01(a), 7.02(a) (defining a "party" as a person criminally responsible for an offense committed by another). Therefore, we hold Aguilar was an accomplice witness as a matter of law. *See Cocke*, 201 S.W.3d at 747–48 (stating a witness is an accomplice as a matter of law if the evidence clearly shows that he, like the defendant, could be prosecuted for the offense or a lesser-included offense).

At the charge conference, defense counsel asked the trial court to include an instruction on Aguilar's status as an accomplice witness as a matter of law. However, the trial court did not instruct the jury that, under Texas law, accomplice-witness testimony must be corroborated. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005).[6] The Texas Court of Criminal Appeals has held that "[w]hen the evidence clearly shows (i.e., there is no doubt) that a witness is an accomplice as a matter of law, the trial judge must instruct the jury accordingly." *Smith*, 322 S.W.3d at 439. Because Aguilar was an accomplice as a matter of law, we hold the trial court erred by failing to provide the jury with an accomplice-witness instruction.

### 4. Harm Analysis

Considering whether the error was harmful "requires us to examine the effect an accomplice-witness instruction has on the trial." *Herron v. State*, 86 S.W.3d 621, 631–32 (Tex. Crim. App. 2002). The instruction, set out in article 38.14, provides:

> A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant

---

[6] Article 38.14 states: "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005).

11

with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005).

"The instruction does not say that the jury should be skeptical of accomplice witness testimony." *Herron*, 86 S.W.3d at 632. "Nor does it provide for the jury to give less weight to such testimony than to other evidence." *Id.* "The instruction merely informs the jury that it cannot use the accomplice witness testimony unless there is also some non-accomplice evidence connecting the defendant to the offense." *Id.* "Once it is determined that such non-accomplice evidence exists, the purpose of the instruction is fulfilled, and the instruction plays no further role in the factfinder's decision-making." *Id.* Accordingly, "non-accomplice evidence can render harmless a failure to submit an accomplice witness instruction by fulfilling the purpose an accomplice witness instruction is designed to serve." *Id.*

"In determining the strength of a particular item of non-accomplice evidence, we examine (1) its reliability or believability and (2) the strength of its tendency to connect the defendant to the crime." *Id.* "[T]he reliability inquiry may be satisfied if: (1) there is non-accomplice evidence, and (2) there is no rational and articulable basis for disregarding the non-accomplice evidence or finding that it fails to connect the defendant to the offense." *Id.* at 633.

In the present case, Aguilar testified appellant solicited money from him in exchange for fixing his speeding ticket. According to Aguilar, the money Monarch Motors paid him for his labor was used as a deposit towards the purchase of the BMW that appellant bought from the dealership. Damian Carrillo placed appellant at the

12

dealership and remembered that appellant and Aguilar had a discussion about a traffic ticket. When the prosecutor asked Damian, "[W]hat was your impression of the deal between" appellant and Aguilar?, he said, "My impression was that they were negotiating the ticket." By "negotiating the ticket," he meant that "[f]or somebody to pay some money and that they take the ticket away." When the prosecutor asked him, "How much money?", he said, "Three hundred and something."

Rene Carrillo, the owner of Monarch Motors, identified the sales contract for a BMW, which he sold to appellant. Rene testified the $350, which Aguilar paid to him, "was just like a down payment" or "a deposit."

Emanuel Carrillo, who worked at Monarch Motors in 2008, paid Aguilar $350 for installing the lighting. Emanuel explained that when somebody makes a deposit on a vehicle, the deposit is applied to the vehicle's purchase price. Regarding appellant's purchase of the BMW, when the prosecutor asked Emanuel, "[Y]ou took a deposit and then later he [appellant] paid for the vehicle?", he said, "Correct." When asked "[h]ow much was paid [for the deposit]?", he said, "$350" in "cash." When the prosecutor asked him, "Did you receive that from the Defendant or did you receive that from someone else?", he said he received it from Aguilar. Emanuel stated that after the deduction for the $350, the purchase price for the BMW was $3,800.

Appellant gave a video-taped statement[7] to Sergeant Marin in which he acknowledged that while he was in uniform, he met a Mexican national at Monarch Motors the day he bought the BMW. He could not remember the Mexican national's

---

[7] This video-taped statement was admitted into evidence and played to the jury during the guilt-innocence stage of appellant's trial.

13

name but stated the Mexican national asked him where he could pay for a traffic ticket. He told him where to pay for the ticket and then gave his phone number to the Mexican national. He denied accepting $350 in exchange for handling the ticket.

The aforementioned evidence provided independent corroboration of the offense, and there is no basis in the record for doubting the reliability of this non-accomplice evidence. Moreover, the non-accomplice evidence tends to connect appellant to the offense. We hold the omission of the accomplice-witness instruction was harmless. *See id.* at 632–33. Issue one is overruled.

## B. Confrontation and Cross-Examination Of Witnesses

In issue two, appellant contends the trial court abused its discretion by denying him the right to cross-examine and confront witnesses. During the State's guilt-innocence stage case-in-chief, the prosecutor called Sergeant Salvador Marin, the lead investigator in this case. When the prosecutor asked him, "Can you tell the jury what initiated, what first prompted you to initiate an investigation [against appellant]?", he said, "I was actually assigned the case by my Captain, Captain Ray Lujan, from C.I.D." At this point, defense counsel objected "to this as being irrelevant and an attempt to bolster these witnesses." The trial court overruled the objection. Later, the prosecutor asked him, "Why, . . . were you assigned this particular investigation, if you know?" Defense counsel objected to the question as "irrelevant in this case," but the trial court overruled the objection.

Rule 33.1 of the Texas Rules of Appellate Procedure governs preservation of error, and states, in part:

(a) In General.-As a prerequisite to presenting a complaint for appellate review, the record must show that:

14

(1) the complaint was made to the trial court by a timely request, objection, or motion that:

(A) stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context;

TEX. R. APP. P. 33.1.

"This Rule encompasses the concept of 'party responsibility.'" *Pena v. State*, 285 S.W.3d 459, 463 (Tex. Crim. App. 2009) (quoting *Reyna v. State*, 168 S.W.3d 173, 176 (Tex. Crim. App. 2005)). "The complaining party bears the responsibility of clearly conveying to the trial judge the particular complaint, including the precise and proper application of the law as well as the underlying rationale." *Id.* at 463–64. "To avoid forfeiting a complaint on appeal, the party must 'let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it.'" *Id.* at 464 (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)). "This gives the trial judge and the opposing party an opportunity to correct the error." *Id.* "Whether a party's particular complaint is preserved depends on whether the complaint on appeal comports with the complaint made at trial. In making this determination, we consider the context in which the complaint was made and the parties' shared understanding at that time." *Id.* (footnote omitted).

In this case, considering the context in which the objections were made, we find that the complaint on appeal does not comport with the complaints made at trial. Thus, the complaints are not preserved for appellate review. *See id.* (citing *Reyna*, 168 S.W.3d

15

at 177); *see also Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002) (stating, "the point of error on appeal must comport with the objection made at trial.").

Later, during Sergeant Marin's direct-examination, the prosecutor asked him, "What were the initial facts as you learned them, as you started your investigation in this case?" Before he could answer the question, defense counsel objected to the question "as being hearsay and a denial of confrontation. He has no personal knowledge of the facts in this case." The trial court overruled the objection; however, Sergeant Marin did not respond to the question. Instead, the prosecutor asked him a different question. Even assuming the trial court erred by overruling the objection, no harm occurred because the question did not elicit any harmful testimony. *See* TEX. R. APP. P. 44.2(b).

When the prosecutor asked Sergeant Marin, "Where did you start [your investigation]?", he said, "I started when I was given some facts or a briefing, if you will, by investigator David Davila and my captain, telling me that we had an issue with one of our deputies possibly involved in a criminal activity." At this point, defense counsel stated, "I object to their statement. It's hearsay, they are denying us the right to confront those witnesses under *Melendez-Diaz*." Without ruling on the objection, the trial judge stated, "You may proceed," and defense counsel did not ask the trial court for a ruling.

It is unnecessary to decide whether this testimony is inadmissible because defense counsel did not preserve error. "To preserve error for review a defendant must receive an adverse ruling on his objection." *Ramirez v. State*, 815 S.W.2d 636, 643 (Tex. Crim. App. 1991). "The ruling must be conclusory; that is, it must be clear from the record the trial judge in fact overruled the defendant's objection or otherwise error is

16

waived." *Id.*

In *Murillo v. State*, 839 S.W.2d 485, 493 (Tex. App.—El Paso 1992, no pet.), Murillo objected to certain testimony, and the trial court responded to the objection by saying, "You may proceed." The *Murillo* Court, relying on the law stated in *Ramirez*, held this response "did not constitute a conclusory or definite ruling adverse to the objection." *Id.* We likewise find the trial court's response in the present case was insufficient to constitute either a conclusory or definite ruling adverse to the objection. *See Ramirez*, 815 S.W.2d at 643; *Murillo*, 839 S.W.2d at 493. We hold this complaint is not preserved for appellate review. In addition, even assuming the trial court's response meant the court overruled the objection and error was properly preserved, we discern no harmful error. *See* TEX. R. APP. P. 44.2(b). In his answer to the question, Sergeant Marin did not say appellant was one of the deputies possibly involved in any criminal activity.

Later, in Sergeant Marin's direct-examination, the prosecutor asked him, "Now, this, . . . phone number[8] that was passed along to you, what was your understanding of how . . . Deputy Davila came by this phone number?" Sergeant Marin replied, "Judge Zaragoza[9] gave that phone number and a name to Investigator Davila, so that's how that came about." At this point, defense counsel asked for and received a "running objection." Defense counsel did not specify the nature of the running objection. However, after receiving the running objection, defense counsel objected that "[u]nder *Crawford v. Washington* and *Melendez-Diaz* . . . this is hearsay and denial of

---

[8] This is a reference to the phone number appellant gave to Jose Luis Aguilar.

[9] Judge Zaragoza is a Bexar County Justice of the Peace, who presided over the court where Aguilar was supposed to pay the fine for his speeding ticket. When Aguilar appeared in Judge Zaragoza's court, he gave the phone number, which appellant gave him, to Judge Zaragoza. Judge Zaragoza, in turn, gave the phone number to Deputy David Davila.

confrontation of witnesses who made these statements." The trial court overruled the objection.

Sergeant Marin's testimony did not constitute hearsay. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." TEX. R. EVID. 801(d). Here, the witness, Sergeant Marin, did not give Judge Zaragoza's out-of-court statement, nor did he offer the contents of Judge Zaragoza's statement—the phone number and the name of the person to whom the phone number belonged—for the truth of the matter asserted. Thus, the trial court did not err by overruling the objection.

Furthermore, the objection is not timely. "An objection is timely if it is made as soon as the ground for the objection becomes apparent, i.e., as soon as the defense knows or should know that an error has occurred." *Grant v. State*, 345 S.W.3d 509, 512 (Tex. App.—Waco 2011, pet. ref'd) (citing *Neal v. State*, 256 S.W.3d 264, 269 (Tex. Crim. App. 2008)). "If a party fails to object until after an objectionable question has been asked and answered, and he can show no legitimate reason to justify the delay, his objection is untimely, and error is waived." *Id.* Here, defense counsel did not specify the grounds for his objection until after the question had been asked and answered. Appellant offers no reason, legitimate or otherwise, to justify the delay. Therefore, error, if any, is waived. Issue two is overruled.

## C. Appellant's Predisposition to Accepting A Bribe

In issue three, appellant contends the trial court abused its discretion by "permitting testimony that implied because [he] is Hispanic, that he would be more likely

as a law enforcement [officer] to accept a bribe, because that is culturally acceptable in Mexico." During the State's redirect-examination of Aguilar, the prosecutor asked him, "Were you ever concerned about making an accusation against a sheriff's deputy?" Before he could answer, defense counsel objected that "[t]his is just an attempt to bolster the witness and it's highly prejudicial." After the trial court overruled the objection, the prosecutor re-asked the question,[10] and defense counsel made no objection to this question.

"As a prerequisite to presenting a complaint on appeal, a party must have made a timely and specific request, objection, or motion to the trial court." *Grant*, 345 S.W.3d at 512 (citing TEX. R. APP. P. 33.1(a)(1)(A)). "It is also necessary that the objecting party must continue to object each time the objectionable question or evidence is offered, obtain a running objection, or request a hearing outside the jury's presence in order to preserve a complaint for appellate review." *Id.*; *see Martinez v. State*, 93 S.W.3d 189, 193 (Tex. Crim. App. 2003); *Fuentes v. State*, 991 S.W.2d 267, 273 (Tex. Crim. App. 1999). In the present case, defense counsel did not object when the prosecutor asked the question a second time, and he did not obtain a running objection, nor did he request a hearing outside the jury's presence. In addition, "a party's 'point of error on appeal must comport with the objection made at trial.'" *Grant*, 345 S.W.3d at 512 (quoting *Wilson*, 71 S.W.3d at 349). Here, defense counsel's objection does not correspond to the point of error raised on appeal. Thus, we conclude this complaint was not preserved for our review.

---

[10] The prosecutor asked Aguilar, "Were you ever concerned about making an accusation against a sheriff's deputy?"

Later, the prosecutor asked Aguilar, "Where you are from in Mexico, is it common for law enforcement officers to take money from citizens?" Defense counsel objected that the question is "completely irrelevant, it's highly prejudicial, the inflammatory nature far outweighs the probative value in this case." The trial court overruled the objection. Because defense counsel's objection does not correspond to the point of error raised on appeal, the complaint is not preserved for appellate review. *See Pena*, 285 S.W.3d at 464 (citing *Reyna*, 168 S.W.3d at 177). Issue three is overruled.

### III. CONCLUSION

We affirm the trial court's judgment.

ROSE VELA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
12th day of April, 2012.